UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

C.A. NO.: _____

| | |
|---|---|
| Schumacher Homes of North Carolina, Inc., and Richard Smothers, | )<br>)<br>) |
| Plaintiffs, | )<br>) **MEMORANDUM OF LAW IN SUPPORT**<br>) **OF MOTION FOR TEMPORARY**<br>) **RESTRAINING ORDER AND** |
| vs. | ) **PRELIMINARY INJUNCTION**<br>) |
| Keith Buchanan and Dianna Buchanan, individually, | )<br>)<br>) |
| Defendants. | )<br>) |

NOW COME Plaintiffs, by and through their undersigned counsel, and submit this Memorandum of Law in support of their Motion for Temporary Restraining Order and Preliminary Injunction. Based on the facts and law, the Court should issue a Temporary Restraining Order and Preliminary Injunction enjoining Defendants, as well as their agents or others in privity with them or under their direction or control, and any and all persons acting by or under the authority of Defendants or in privity with them, from tortiously interfering with Plaintiffs' client relationships, contacting current and prospective clients of Schumacher Homes of North Carolina, Inc. ("Schumacher Homes") via e-mail and/or Internet, and publishing false and defamatory information about Plaintiffs and their business operations.

Such destructive misconduct by Defendants already has caused and, unless enjoined, will continue to cause Plaintiffs to suffer irreparable harm to their business brand and reputation, as well as significant financial loss. Unless Defendants are immediately restrained, Plaintiffs will

continue to suffer ongoing and irreparable harm to its business and hard-earned reputation and goodwill.

## **RELEVANT FACTS**

For purposes of the requested TRO and Preliminary Injunction, the relevant facts are as follows:

Plaintiff Schumacher Homes is a licensed General Contractor in the State of North Carolina and is one of the largest residential, custom home builders in the United States. Schumacher Homes and its affiliate companies have built over 19,000 homes across 22 states since its formation in the early 1990s and has received numerous awards and recognitions for its commitment to excellence in constructions standards and customer satisfaction. (Verif. Compl. at ¶¶ 9-11).

Schumacher Homes builds high-quality, custom homes and has received numerous awards and recognitions for its commitment to excellence in construction standards and customer satisfaction, including, but not limited to:

- The National Housing Quality Award for Excellence;
- The National Gold Winning Home of the Year as recognized by the National Association of Home Builders;
- International Builders Show for Best Multi-Generational Homes;
- National Gold Winning Best Digital Sales Tool / Use of Technology by the National Association of Homebuilders;
- National Gold Winning Website of the Year by the National Association of Home Builders;
- National Gold Winning E-mail Marketing Campaign of the Year by the National Association of Home Builders;
- Ranked Number One in Best Design Studio in America Award by the National Association of Home Builders;
- 2020 Platinum Builder Award Winner for excellence in customer satisfaction, demonstrating skilled craftsmanship constructing inspired homes, and leadership in design and construction technology;

- Ranked Best in American Living Award for Best One-of-a-Kind Custom Homes over 6,500 sq. ft., presented by Professional Builder Magazine; and
- Watermark Award for Best Owner Bath in a Custom Home in the Nation, presented by Builder magazine.

Schumacher Homes, Inc. has spent decades dedicating itself to meeting client needs and building a well-known and trusted brand around high-quality custom homes. (Verif. Compl. at ¶ 12-13).

Smothers serves as the Qualified General Contractor and Regional Manager of the Carolinas Region for Schumacher Homes. He is a General Contractor with an Unlimited License issued by the State of North Carolina. (Verif. Compl. at ¶¶ 14-15). As a licensed General Contractor in the State of North Carolina, Smothers has demonstrated the following qualifications to the satisfaction of the North Carolina Licensing Board for Contractors ("Board"), as required by N.C. Gen. Stat. § 87-10:

a. Possess good moral character as determined by the Board;

b. Shows evidence of financial responsibility, as determined by the Board;

c. Passed an examination that contained subject matter related to contracting classification(s); and

d. Adheres to various capital and liability requirements.

As the holder of an Unlimited License, Smothers is entitled to act as a General Contractor without restriction as to the value of any single project. (Verif. Compl. at ¶¶ 16-17).

In order to become the Qualified General Contractor for Schumacher Homes, Smothers passed the Board's statutorily-mandated examination, demonstrating the following proficiencies:

a. The ability to practically apply his knowledge of the profession of contracting;

3

b. The capacity to read plans and specifications, knowledge of relevant matters contained in the North Carolina State Building Code, knowledge of estimating costs, construction, ethics, and other similar matters pertaining to the contracting business; and

c. The knowledge as to the responsibilities of a contractor to the public and of the requirements of the laws of the State of North Carolina relating to contractors, construction, and liens.

(Verif. Compl. at ¶ 18).

In addition to the proficiencies and licenses described above, Smothers has over twenty (20) years of experience in the construction industry. He has spent decades building high-quality and award-winning homes and dedicating himself to his clients and their communities. Smothers also has received numerous awards in his own right, including being the youngest inductee into the Hall of Fame for the North Coast Building Industry Association, which is a non-profit association dedicated to the advancement of the building industry. As a result, and as the above-referenced awards and accomplishments reflect, Smothers has an excellent reputation in the residential construction industry. (Verif. Compl. at ¶¶ 19-21).

On or about September 14, 2018, Schumacher Homes entered into a valid and enforceable contract with Defendants to build a custom home. During the construction of Defendants' home, Plaintiffs repaired, remedied, and/or made accommodations for any and all issues that were brought to the attention of Plaintiffs by Defendants. For instance, Plaintiffs replaced Defendants' thermostat at no additional cost to Defendants when the thermostat installed in the home did not work as intended. Defendants still were not satisfied with some aspects of their new home and, as a result, Schumacher Homes offered approximately $10,000 in credits to allow them to remodel window trim and a shower to their satisfaction. (Verif. Compl. at ¶¶ 28-32).

McDowell County's Building Inspection Department inspected Defendants' home and the work conducted by Schumacher Homes or its subcontractors on numerous occasions. McDowell

4

County's Building Inspection Department conducted periodic inspections of the Defendants' home throughout the construction process. Any violations of the North Carolina Building Code identified by McDowell County Inspections Department were promptly corrected and passed inspection to the Building Department's satisfaction. As the construction of the Defendants' home neared completion, McDowell County Building Inspection Department issued a "Certificate of Occupancy" for Defendants' home. A "Certificate of Occupancy" is a document issued by a local government agency certifying a building's compliance with applicable building codes and laws, which certifies that the building is in a condition suitable for occupancy. (Verif. Compl. at ¶¶ 33-36).

At the close of construction, Defendants identified a few minor workmanship issues related to their home. Defendant Keith Buchanan signed a punch list detailing the issues and Plaintiffs corrected all items identified on the punch list. (Verif. Compl. at ¶¶ 37-39).

Shortly after moving into their home, Defendants contacted Plaintiffs regarding additional issues that Defendants wished to have addressed. Schumacher Homes agreed to send its Warranty Representatives to resolve the issues, but Defendants would not grant them access to the home, ostensibly because Thanksgiving was approaching. After Thanksgiving, Defendants again refused to engage with Plaintiffs' Warranty Representatives, thereby denying Plaintiffs access to Defendants' home completely. As a result, Defendants did not provide Plaintiffs with an opportunity to resolve any of the alleged new issues. Notably, although Defendants would not allow a Schumacher Homes representative to evaluate the home or address any of the Defendants' concerns, allegedly due to the approaching holiday season, Defendants, nevertheless, allowed a third-party inspector to inspect the house on or about December 12, 2019. (Verif. Compl. at ¶¶ 40-45).

5

Case 1:21-cv-00260-MOC-WCM   Document 4   Filed 09/28/21   Page 5 of 16

Defendants also refused to pursue the requisite arbitration through American Arbitration Association regarding any alleged deficiencies in their home, which was mandated by the contract governing the construction of Defendants' home. Instead, they maliciously, willfully, and wantonly designed and implemented an electronic mailing campaign and website that targeted Plaintiffs' current and prospective clients with the purpose of damaging Plaintiffs' business reputation and brand and reducing its volume of business. (Verif. Compl. at ¶¶ 46-47).

Defendants apparently obtained Plaintiffs' clients' information from building permits, which are matters of public record, and launched an electronic mailing campaign in 2021, wherein Defendants directly contacted Plaintiffs' clients to spread false and misleading information regarding Plaintiffs. Defendants also published to third parties, including, but not limited to the Plaintiffs' current and prospective clients, knowingly false and misleading statements, such as:

   a. Plaintiffs "lack… job site supervision" by failing to have a General Contractor present onsite at all times during building and construction phase;
   b. Plaintiffs use "unqualified and/or untrained labor;"
   c. Plaintiffs use "inferior or differentiating components than advertised;"
   d. Banks and financial institutions refuse to issue mortgages, loans, and other financial lending options relating to homes built by Plaintiffs; and
   e. Schumacher Homes Inc. is banned from building homes in neighborhoods.

(Verif. Compl. at ¶¶ 49-51). Defendants were not party to any of the negotiations or contracts Plaintiffs had with its clients and had no legitimate business interest that would justify contacting Plaintiffs' current or prospective clients. (Verif. Compl. at ¶¶ 52-53).

Plaintiffs' ongoing work over more than two decades and Schumacher Homes' award-winning development of an established brand has resulted in an increasing stream of business

6

throughout the country, including in North Carolina.  As a result of Defendants' statements, however, which were made with Defendants' knowledge of their untruthfulness and/or Defendants' reckless indifference to their lack of truthfulness, the Plaintiffs have suffered, and continue to suffer, irreparable harm to their business, brand, goodwill, and reputation, as well as significant financial loss.  (Verif. Compl. at ¶¶ 54-55).

In addition to their e-mail campaign against Plaintiffs, Defendants designed and created a website called "https://schumachervictims.com" to knowingly disseminate false and misleading information concerning the Plaintiffs.  Defendants have exercised full dominion and control over the website since its inception, including the content that is published on it, and it contains photographs of their home taken during a third-party home inspection, along with other content. (Verif. Compl. at ¶¶ 57-60).

Defendants' website publishes to the entire Internet universe, which includes but is not limited to the Plaintiffs' current and prospective clients, knowingly false and misleading statements about the Plaintiffs, many of which are identical or substantially similar to those contained in their e-mail campaign.  (See supra).  Defendants have misleadingly characterized their website as an "advocacy group" when, in fact, it was created by and exists for the purposes of only two individuals, the Defendants, as an instrument to unlawfully further their own apparent vendetta against Plaintiffs.  (Verif. Compl. at ¶ 61-62).

## **PROPRIETY OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, a temporary restraining order ("TRO") or preliminary injunction may be issued without notice to the adverse party, and the standard for granting either is the same.  Cooksey v. Futrell, No. 3:12CV336, 2012 WL

7

3257811, at *2 (W.D.N.C. Aug. 8, 2012). TROs "may be issued without full notice, even, under certain circumstances, *ex parte*." Fed.R.Civ.P. 65(b); Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 422 (4th Cir. 1999). The decision to grant a TRO or preliminary injunction rests within the discretion of the district courts. Meiselman v. Paramount Film Distrib. Corp., 180 F.2d 94, 96 (4th Cir. 1950). The primary function of both is to maintain or restore the status quo. See, e.g., Di Biase v. SPX Corp., 872 F.3d 224, 231 (4th Cir. 2017); see also Hoechst Diafoil, 174 F.3d at 422.

A plaintiff seeking a TRO or preliminary injunction must demonstrate that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm absent injunctive relief, (3) the balance of equities tips in its favor, and (4) the injunction would be in the public interest. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). Each element must be satisfied, but movants "need not show a certainty of success." Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 347 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089, 130 S. Ct. 2371, 176 L. Ed. 2d 764 (2010), followed in part sub nom. The Real Truth About Obama, Inc. v. F.E.C., 607 F.3d 355 (4th Cir. 2010).

"A [TRO or] preliminary injunction is an extraordinary remedy never awarded as of right." Winter, 555 U.S. at 24. Thus, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542 (1987). Ultimately, a plaintiff's entitlement to preliminary injunctive relief is a matter of discretion with the Court. See Metropolitan Reg'l Info. Sys., Inc. v. American Home Realty Network, Inc., 722 F.3d 591, 595 (4th Cir. 2013).

"When considering a motion for [a TRO or preliminary injunction], a district court may assess the relative strength and persuasiveness of the evidence presented by the parties, and is not

8

required to resolve factual disputes in favor of the non-moving party." Queen Virgin Remy, Co. v. Thomason, No. 1:15-CV-1638-SCJ, 2015 WL 11422300, at *2 (N.D. Ga. June 10, 2015), modified, No. 1:15-CV-1638-SCJ, 2015 WL 11455760 (N.D. Ga. Oct. 21, 2015) (citing Imaging Business Machines, LLC. v. BancTec, Inc., 459 F.3d 1186, 1192 (11th Cir. 2006)). If the evidence is contested, however, the court "'must assess the facts, draw whatever reasonable inferences it might favor, and decide the likely ramifications.'" Weaver v. Henderson, 984 F.2d 11, 14 (1st Cir. 1993) (quoting Independent Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir. 1988)).

At the TRO and/or preliminary injunction stage, allegations set forth in a verified complaint are treated the same as affidavits. IDS Life Ins. Co. v. SunAmerica Life Ins. Co., 136 F.3d 537, 542 (7th Cir. 1998) (noting that "[v]erified complaints[ are] the equivalent of affidavits"); Synthes USA, LLC v. Davis, No. 4:17-CV-02879-RBH, 2017 WL 5972705, at *1 (D.S.C. Dec. 1, 2017) (explaining that "a verified complaint is wholly sufficient for purposes of ruling on a preliminary injunction motion.") (citation omitted).[1]

### A. Plaintiffs' Likelihood of Success on the Merits

Because of the myriad and virtually insurmountable First Amendment obstacles inherent in any attempt to enjoin or restrain pure speech, even defamatory speech, Plaintiffs presently seek the Court's injunctive intervention only on the basis of Defendants' tortious interference with Plaintiffs' current and prospective clients. On that basis, nonetheless, Plaintiffs' likelihood of success on the merits is evident.

---

[1] The Fourth Circuit, in fact, has indicated that a complaint, whether verified or not, must be considered. Synthes USA, 2017 WL 5972705, at *1 (citing G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd., 822 F.3d 709, 725–26 (4th Cir. 2016), vacated and remanded on other grounds, 137 S. Ct. 1239 (2017).

9

Under North Carolina law, to state a claim for tortious interference with contract a plaintiff must allege: (1) the existence of a valid contract between the plaintiff and a third person; (2) the defendant knew of this contract; (3) the defendant intentionally induced the third person not to perform the contract; (4) the defendant's acts were committed without justification; and (5) the plaintiff suffered actual damage. Barker v. Kimberly-Clark Corp., 136 N.C. App. 455, 462, 524 S.E.2d 821, 826 (2000). Whether a defendant's interference with a contract is justified depends on the surrounding circumstances; the defendant's motive or conduct; the interests sought to be advanced; the social interest in protecting the freedom of defendant's action; and plaintiff's contractual interests. Embree Const. Grp., Inc. v. Rafcor, Inc., 330 N.C. 487, 498, 411 S.E.2d 916, 924 (1992).

The Verified Complaint establishes that Schumacher Homes has entered into valid construction contracts with clients, including a valid contract with Defendants, and that Defendants e-mail campaign and website have urged, at times successfully, those clients to simply walk away from their business dealings with Plaintiffs. Indeed, the Plaintiffs have asserted and provided evidence that the Defendants have falsely communicated information to the Plaintiffs' customers to damage the Plaintiffs' reputation, brand, and goodwill, and to inflict financial harm on the Plaintiffs. (See Declaration of Richard Smothers). The Plaintiffs have provided a sampling of e-mails[2] demonstrating that at least some of the Plaintiffs' clients have suddenly decided to stop doing business with Plaintiffs after becoming aware of the misinformation peddled by the Defendants, indicating that the Defendants' efforts are having some success.

---

[2] The e-mail addresses of the clients whose e-mails are included as exhibits to the Declaration of Richard Smothers have been redacted in order to protect their privacy interests.

The Verified Complaint further establishes that the Defendants have no legitimate interest in the Plaintiffs' business dealings with other parties and that the Defendants' actions were committed without justification and have resulted in actual damage to the Plaintiffs. Based on the evidence, the Court should conclude that the Plaintiffs have established a likelihood of success on the merits on their claim for tortious interference with contract against the Defendants.

Because the Plaintiffs' evidence establishes a likelihood of success on the merits on the claim for tortious interference with contract, the Plaintiffs also can show a likelihood of success on the merits on their claim for tortious interference with prospective economic advantage by demonstrating the existence of "a contract that would have been entered into but for the defendant's conduct." Movement Mortg., LLC v. McDonald, No. 3:17-cv-00716-RJC-DSC, 2018 WL 6733953, at *5 (W.D.N.C. Nov. 6, 2018), report and recommendation adopted, No. 3:17-cv-00716-RJC-DSC, 2019 WL 452773 (W.D.N.C. Feb. 5, 2019) (citing Beck v. City of Durham, 154 N.C. App. 221, 231, 573 S.E.2d 183, 191 (2002)).

As noted in the Verified Complaint, the Defendants apparently obtained information on Plaintiffs' clients from building permits, which are matters of public record. The Defendants then reached out to those clients via e-mail and/or the website and deceived them by making defamatory statements about Plaintiffs in order to persuade them, according to the e-mails and website, to stop doing business with the Plaintiffs. Some of those efforts have been successful, as reflected in the attached Declaration of Richard Smothers. On that basis, the Court should determine that the Plaintiffs have established a likelihood of success on the merits on their claim for tortious interference with prospective economic advantage.

### B. Irreparable Harm

The Supreme Court's "frequently reiterated standard requires [a plaintiff] seeking [interim] relief to demonstrate that irreparable injury is likely in the absence of an injunction." Winter, 555 U.S. at 22. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of an injunction are not enough." Roe v. Dep't of Def., 947 F.3d 207, 228 (4th Cir. 2020) (quoting Di Biase, 872 F.3d at 230. On the other hand, "[t]he possibility of permanent loss of customers… or the loss of goodwill may give rise to irreparable harm." Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc., 700 F. App'x 251, 263 (4th Cir. 2017) (quoting Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 552 (4th Cir. 1994)), abrogated on other grounds by Winter, 555 U.S. at 22).

Here, the evidence shows that Schumacher Homes has spent decades building its brand and reputation. That work has paid off steadily, not only in the company's many awards and recognitions, but also in the satisfied customers, ongoing growth, and goodwill that have been earned. The Plaintiffs have shown that the Defendants' actions are damaging its reputation and causing customers to terminate their relationships with the Plaintiffs. Adding insult to injury is the fact that Defendants are not even competitors hoping to steal some of Plaintiffs' business for themselves. Instead, they are disgruntled clients who, having refused to cooperate with Plaintiffs' efforts to make things right or to avail themselves of the contractually-mandated remedies available to address their alleged grievances, are determined to destroy Plaintiffs' reputation and goodwill and ruin the business of Schumacher Homes. Damages stemming from such vengeful misconduct are, at best, difficult to quantify and are prime examples of the type of irreparable harm that is best addressed by injunctive relief. See, e.g., Douglas Dynamics, LLC v. Buyers Prod. Co., 717 F.3d 1336, 1344 (Fed. Cir. 2013) ("[i]rreparable injury encompasses different types of losses

12

that are often difficult to quantify, including lost sales and erosion in reputation and brand distinction.").

The irreparable harm to the Plaintiff will only worsen if the Defendants continue their smear campaign via e-mail and Internet. See Handsome Brook Farm, 700 F. App'x at 263 ("The business's reputation continues to be tarnished as questions about [it] continue to circulate."). The Defendants have shown no inclination to stop their malicious misconduct and reasonably can be expected to continue their efforts to harm the Plaintiffs unless enjoined by the Court. Because the Defendants' conduct is causing damage to the Plaintiffs' reputation, erosion of brand, loss of goodwill, and lost sales that ultimately may not be quantifiable, the Court should conclude that the Plaintiffs have demonstrated they are suffering, and will continue to suffer, an irreparable harm in the absence of interim relief.

### C. Balance of Equities

A plaintiff seeking interim injunctive relief must establish that the balance of equities tips in its favor. Winter, 555 U.S. at 20. "[I]n each case the Court 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" Armento v. Asheville Buncombe Cmty. Christian Ministry, Inc., No. 17-cv-00150- MR-DLH, 2017 WL 3838638 at *1 (W.D.N.C. Sept. 1, 2017) (Reidinger, J.) (quoting Amoco Prod. Co., 480 U.S. at 542).

Plaintiffs have demonstrated that their brand, business, reputation, and goodwill are being eroded by Defendants' continuing efforts to ruin them. There are no legitimate equity interests in allowing Defendants' unlawful actions to continue unabated. Even some marginally plausible interest in favor of allowing Defendants' vendetta to go unchecked pales in comparison to the

rights of Plaintiffs to avoid having their business and brand systematically harmed by disgruntled customers who have no legal or equitable interest whatsoever in the customer relationships they are destroying. The harm to Plaintiffs – including loss of goodwill, damage to reputation, and interference with third-party contracts – is clear.

### D. Public Interest

A plaintiff seeking a preliminary injunction must show that the granting of an injunction is in the public interest. Winter, 555 U.S. at 20. There is a public interest in preventing current and potential customers and clients from being misled. See, e.g., Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc., 43 F.3d 922, 939 (4th Cir. 1995) (holding that an injunction "would serve the public interest by preventing future consumers from being misled"). Indeed, the North Carolina legislature, by enacting the Unfair and Deceptive Trade Practices Act, specifically declared such deceptive acts to be unlawful, and provided significant civil penalties for such acts in or affecting commerce. See N.C.G.S. § 75-1.1 Likewise, recognition by the courts of legal recourse for claims of civil conspiracy, tortious interference with contract and prospective economic advantage is clear evidence that there is a strong public interest in preventing such misconduct.

Conversely, there is no public interest in allowing wrongdoers to continue to do wrong, particularly when their misconduct is causing harm for which later monetary sanctions will not be an adequate remedy. Defendants have no legal interest in Plaintiffs' business dealings with other parties, but they have initiated and continued their predatory actions purely in an attempt to cripple or destroy Schumacher Homes. Protection by the courts from such unjustified conduct by wrongdoers both incentivizes and reassures those in the marketplace that their investments in quality work product, customer satisfaction, and goodwill cannot be undone by one or two

14

individuals with Internet access and a loose regard for the truth. Thus, the public interest is best served by granting interim injunctive relief to prevent Defendants from further, and potentially irreparable, destruction of Plaintiffs' business, brand, and goodwill.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court issue the requested TRO and, after notice and a hearing, preliminary injunctive relief to restore and protect the status quo during the pendency of this action.

BARNWELL WHALEY PATTERSON & HELMS, PLLC

*/s/ Christopher M. Hinnant*
Christopher M. Hinnant, Esq.
NC Bar No. 24297
E-mail: chinnant@barnwell-whaley.com

*/s/ Paul H. Derrick*
Paul H. Derrick, Esq.
NC Bar No. 27366
E-mail: pderrick@barnwell-whaley.com

201 North Front Street, Suite 1003
Wilmington, North Carolina 28401
Telephone: (910) 679-1338

**COUNSEL FOR PLAINTIFFS**

September 28, 2021

Wilmington, North Carolina

## CERTIFICATE OF SERVICE

This is to certify that today the foregoing document was electronically filed using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

This 28th day of September, 2021.

                                                  */s/ Paul H. Derrick*

                                                  Paul H. Derrick